**EXHIBIT A**

State Of Maine                                        Superior Court
Cumberland, ss.                                       Civil Action
                                                      Docket No.:

|  |  |
|---|---|
| Conrod O. Wilson, | ) |
| Plaintiff, | ) |
|  | ) |
|  | ) |
|  | ) |
| v. | ) |
|  | ) |
| Best Western International, Inc., | ) |
| Best Western Plus Augusta | ) |
| Civic Center Inn, | ) |
| GIRI Hotel Management, LLC, | ) |
| GIRI Management, LLC, | ) |
| GIRI Hotels, LLC, | ) |
| and | ) |
| GIRI Community Drive, LLC | ) |
| Defendants. | ) |
|  | ) |

## Complaint and Demand For Jury Trial
## and Injunctive Relief Sought

### Summary of the Action

1.     The Best Western hotel in Augusta, Maine illegally fired Conrod

Wilson a week after he complained about being unfairly demoted because he

is black. Mr. Wilson's supervisor told him he was demoted because the owner

wanted to replace him with "an older white woman." Before this demotion

Mr. Wilson was recognized as a "great employee," who earned the honor of

employee of the month and  a superb  performance evaluation, with a score of

9 out of 10 in all categories. One week after he complained about his

demotion, he was fired for the false reason that he had walked off the job, when he had actually left work to attend a doctor's appointment that had been approved in advance by his supervisor. Other employees engaged in actual misconduct, including repeatedly leaving dirty or blood-soaked sheets on beds, stealing tips, and eating food paid for by customers, but were not terminated. The Maine Human Rights Commission found reasonable grounds to believe that Mr. Wilson's firing was illegal retaliation.

## Parties

2.     Plaintiff, Conrod O. Wilson, is a citizen of the United States and is a resident of Farmingdale, Kennebec County, Maine.

3.     Defendant Best Western International, Inc. is a corporation incorporated in Arizona.

4.     Defendant Best Western Plus Augusta Civic Center Inn is a business doing business in Maine.

5.     Defendant GIRI Hotel Management, LLC, is an entity doing business in Maine. It has an established place of business in Brunswick, Cumberland County, Maine.

6.     Defendant GIRI Management, LLC, is an entity doing business in Maine. It has an established place of business in Brunswick, Cumberland County, Maine.

7.     Defendant GIRI Hotels, LLC, is an entity doing business in Maine. It has an established place of business in Brunswick, Cumberland County, Maine.

8.     Defendant GIRI Community Drive, LLC, is an entity doing business in Maine.

## Jury Trial Demand

9.     Under Me. R. Civ. P. 38(b), Plaintiff hereby demands trial by jury on all issues triable to a jury.

## Facts

10.     Conrod O. Wilson is a United States Citizen who is black and was born in Jamaica.  When he was fired by Defendants, he was 34 years old.

11.     Mr. Wilson began work on March 25, 2011 at the Best Western Plus Augusta Civic Center Inn as a housekeeper.

12.     Best Western is owned, operated, and controlled by a network of corporations and businesses, including Best Western International, Inc., GIRI Hotel Management, LLC, GIRI Hotels, LLC, GIRI Management, LLC, and GIRI Community Drive, LLC. (Collectively "Best Western")

13.     Best Western International, Inc., GIRI Hotel Management, LLC, GIRI Hotels, LLC, GIRI Management, LLC, and GIRI Community Drive,

LLC shared and co-determined the conditions of Mr. Wilson's employment while he worked at Best Western, including controlling Mr. Wilson's day-to-day activities, his hiring and firing, the work rules and conditions of his employment, and his work assignments.

14.    Mr. Wilson's supervisor during his employment was Kathy Paradis.

15.    The General Manager of the hotel was Jeffrey Howes.

16.    Before February 2013, Mr. Wilson was recognized as a good employee.

17.    In May 2011 Mr. Wilson was awarded employee of the month.

18.    Mr. Wilson received his 90 day probationary performance review on July 8, 2011, and, on a scale of 1-10, he was rated "9" in every category.

19.    His supervisor, Kathy Paradis, wrote in this official evaluation that Mr. Wilson was: a "great employee. He is always helpful. Never stops working. Never complains. Does anything asked of him. And more."

20.    Mr. Wilson never received any discipline from Best Western before he complained about discrimination.

21.    On January 31, 2012, Mr. Wilson slipped on the ice at work and injured his right shoulder and neck. He saw a doctor the next day, February 1, 2012, who diagnosed him with neck and lumbar strain. The

4

doctor estimated full recovery in 2-4 weeks and recommended physical therapy.

22.    The doctor gave Mr. Wilson work restrictions that included no squatting, kneeling, lifting, pushing, or pulling more than 10 pounds or lifting above his head.  The doctor informed Jeff Howes and Kathy Paradis of these work restrictions.

23.    During these first several months after his injury, Best Western did not modify Mr. Wilson's job to honor his medical restrictions.  He continued performing the housekeeping tasks he was assigned although they caused him pain.

24.    By the end of March 2012, Mr. Wilson's symptoms still had not improved. He continued to receive regular care for his shoulder and neck, with his employer receiving regular updates from the doctor concerning his prognosis and need for restrictions.

25.    About six months after Mr. Wilson's injury, Best Western finally placed him in a light duty position in the breakfast room of the hotel.  Ms. Paradis told him that this would be a good position for him because of his good customer service skills.

26.    The breakfast room was a more prestigious position than housekeeping because the breakfast room employee had more interaction with customers and was the public face of Best Western.

27.     As part of his job duties in the breakfast room, Mr. Wilson was required to work in an unheated back room that opened to the outside. There was a large gap under the door where snow blew in.

28.     Mr. Wilson repeatedly asked for a Best Western sweater to wear when he was required to work in this frigid back room. Although Best Western sweaters were routinely provided to white employees, Ms. Paradis refused to provide one for him.

29.     When he tried to wear his own personal sweater, Best Western required him to remove it because it did not have a Best Western logo.

30.     Mr. Wilson worked in the frigid back room without a sweater through the winter of 2012-2013, until February 14, 2013.

31.     On about February 7, 2013, Mr. Wilson was working as the breakfast room attendant when he saw a man he had never seen before looking at him.

32.     This man gave Mr. Wilson a strange look and seemed surprised and unhappy to see Mr. Wilson in the breakfast room. Mr. Wilson was later told by other employees that this man was "the owner" of GIRI.

33.     February 13, 2013 was Mr. Wilson's day off. He missed a phone call from Ms. Paradis. She left a voicemail message saying:

> Hey Conrod, this is Kathy, um, tomorrow you are going to be in P.C. not breakfast, so you don't have to come in early, uh, if you want to

6

come in, like, at 6:30 or 7:00, it's okay, but we have a special Best Western guy coming for the breakfast room tomorrow, and I'll explain more when I see you, uh, so, you're coming in for P.C. tomorrow, so you'll be doing the bathrooms, hallways and stairwells and all that. Ok, see you tomorrow.

34.    When Mr. Wilson came to work the next day, Valentine's Day, February 14, 2013, he saw a new employee working in the breakfast room. She was an older white woman, and she was wearing a Best Western sweater.

35.    Mr. Wilson went to Kathy Paradis for an explanation, as she had instructed him to do in her voicemail.

36.    Ms. Paradis explained to him that they were having a visit from high level management officials with the company that morning and that "the owner said he wanted an older white woman" working in the breakfast room instead of Mr. Wilson.

37.    Ms. Paradis also told Mr. Wilson that "Ash agrees with him [the owner]." Ash was a reference to Ashish Sangani, an owner of Best Western.

38.    Mr. Wilson told Ms. Paradis that he believed removing him from the breakfast room because the owner wanted an older white woman in the position was discrimination.

7

39. Ms. Paradis responded to Mr. Wilson's complaint of illegal discrimination in part by saying "it's not me, Conrod, it's the owner."

40. Only Ms. Paradis and Mr. Wilson were present for this conversation.

41. At the direction of Mr. Sangani, Best Western deliberately limited its search for the employee who displaced Mr. Wilson in the breakfast room to its own retirees, who were predominately older, white, and female.

42. The employee hired to replace Mr. Wilson in the breakfast room was 25 years older than him, white, and female. Her initials are L.V.

43. Mr. Wilson was moved back to housekeeping that day and was never again assigned to the breakfast room.

44. Later in the same day, February 14, 2013, Mr. Wilson requested a second meeting with Ms. Paradis and that a third person be present for that meeting.  Ms. Paradis's assistant Emily Frost was present for this second conversation.

45. At this meeting, Mr. Wilson again told Ms. Paradis that he believed that removing him from the breakfast room because the owner wanted an older white woman to replace Mr. Wilson was discrimination.  At this point Ms. Paradis denied her earlier statement, saying "I did not say that" and instead claimed that what she had said earlier was "he wanted an older lady."

8

46.     February 14, 2013, was Mr. Wilson's first day in over five months working in housekeeping. Because he had not worked in the housekeeping position recently, Mr. Wilson forgot to hand in the housekeeping checklist at the end of his shift on February 14, 2013.

47.     The housekeeping checklist was less complicated than the inventory Mr. Wilson had been filling out after each shift in the breakfast room.

48.     When he was returned to the housekeeping position in February 2014, Mr. Wilson had no objection to or problem with filling out the housekeeping checklist.

49.     In Mr. Wilson's past experience performing the housekeeping position in 2011 and 2012 before he was moved to the breakfast position, the housekeeping checklist was not considered an important document and was not strictly enforced by management. Although he had forgotten to turn in the checklist in 2011 and 2012, until Mr. Wilson complained about discrimination he had never been disciplined for forgetting to turn in the checklist on time.

50.     He brought the checklist for February 14, 2013 to work the next morning, February 15, 2013, and handed it in to Ms. Paradis.

51.     That day, February 15, 2013, the very next day after he complained to Ms. Paradis about race discrimination, Ms. Paradis gave him a

written "verbal warning" for not filling out the checklist on February 14 **and** February 15.

52.     This discipline was false because Mr. Wilson did not fail to turn in the checklist for February 15.

53.     Ms. Paradis gave Mr. Wilson the discipline before he even finished his work for the day on February 15.

54.     When he received that verbal warning on February 15, Mr. Wilson could not possibly have already failed to turn in the checklist for that day, which was not supposed to be handed in until after he finished work.

55.     Mr. Wilson submitted the checklist on time on February 15 and every day thereafter.

56.     Three days later, on February 18, 2013, Best Western hired a new male employee with the initials H.T to replace Mr. Wilson.

57.     That day, Mr. Wilson saw H.T. doing the same housekeeping job Mr. Wilson had been reassigned to do.

58.     The same day, February 18, 2013, Mr. Wilson requested a meeting with Mr. Howes. Ms. Paradis was also present at this meeting.

59.     At this meeting, Mr. Wilson told Mr. Howes that he believed that replacing him in the breakfast room because the owner wanted an older white woman in the position was discrimination.

60.     During that meeting, Ms. Paradis again explained to him in front of Mr. Howes that the owner said he wanted an older lady in the breakfast room.  Mr. Howes did not say anything in response to Mr. Wilson's complaint of discrimination except that Mr. Wilson needed to follow rules.

61.     At this meeting, Mr. Wilson understood from the tone and body language of the two managers that he was being pressured to quit.

62.     Ms. Paradis wrote another written warning, dated February 18, 2013, stating: "I have ask [sic] Conrod daily to make out the proper paper work.  He refuses. If he does not do the paper work he could be let go!"

63.     This written warning falsely states that Mr. Wilson refused to sign it.

64.     Mr. Wilson was never shown this warning when he was still working for Best Western and was never asked to sign it.

65.     The reasons for the February 18, 2013 written warning are false. Mr. Wilson submitted the proper housekeeping paperwork on time every day in February except on February 14.

66.     Also on February 18, 2013, two business days after L.V. started work in the breakfast room, Ms. Paradis ordered a Best Western sweater in L.V.'s size.  The sweater Ms. Paradis ordered would not have fit Mr. Wilson.

67.     Two days later, on February 20, 2013, Mr. Wilson had a doctor's appointment for his work-related shoulder injury.  He had given Ms. Paradis

11

advance notice of this appointment, as he always did.  The appointment required him to leave work earlier than he otherwise would have.

68.    On February 20, 2013, Mr. Howes summoned Mr. Wilson to a bathroom Mr. Wilson had already cleaned.  The bathroom was clean, except that there were paper towels on the floor and the paper towel dispenser needed to be refilled.  The floor was not sticky and the condition of the bathroom was typical for a bathroom that had been recently cleaned.  Mr. Howes insisted that Mr. Wilson had not cleaned the bathroom and ordered him to clean the clean bathroom again.

69.    Mr. Wilson cleaned up the paper towels from the floor in addition to completing the other cleaning tasks Ms. Paradis had already assigned him to do.  Because Mr. Wilson also had to clean the main stairs and hallway, he did not have time to get more towels to refill the dispenser.  .

70.    As Mr. Wilson was leaving for his doctor's appointment, he reminded Ms. Paradis where he was going and told her about the paper towel dispenser that needed to be refilled.  Ms. Paradis did not tell Mr. Wilson that there was any problem with him leaving for his medical appointment

71.    General Manager Jeff Howes called Mr. Wilson  that afternoon at 1:13 p.m. and left him a voicemail message saying:

> Hey Conrod it's Jeff at work. Um. Just calling
> to find out where you went. I see you punched
> out but stuff I asked you to do hasn't been done

12

so obviously you quit. I [inaudible] think it's a
smooth mover but it's your call so. Good luck.
Bye.

72.     Mr. Wilson went in to work the following morning to explain to

Mr. Howes that he had not quit and that he was at a worker's comp doctor's

appointment and that Ms. Paradis had excused him from work.

73.     At that meeting, Mr. Howes told Mr. Wilson that he was being

fired. Mr. Howes told him to leave and that "it is on record that you are

fired."

74.     On August 1, 2013, Mr. Wilson filed a complaint with the Maine

Human Rights Commission (MHRC) and the Equal Employment Opportunity

Commission (EEOC) alleging employment discrimination because of race,

color, national origin, and age and that he had been retaliated against for

complaining about and opposing what he reasonably believed was unlawful

discrimination.

75.     On November 18, 2013, Mr. Wilson filed an amended complaint

adding that he believed he was also discriminated against based on sex and

that the retaliation was in part for complaining about and opposing sex

discrimination.

76.   The MHRC investigated Mr. Wilson's complaint, including in-person interviews of Mr. Wilson and Mr. Howes and a telephone interview of Ms. Paradis.

77.   Best Western made false and shifting statements to the MHRC during the investigation.

78.   In a written statement received by the MHRC on September 30, 2013, Best Western stated that Mr. Howes told Mr. Wilson "he was terminated because of his ongoing disregard for company procedure and failure to perform his duties as expected."

79.   During a MHRC "Issues and Resolution Conference" on December 23, 2014, in response to a question from the MHRC Investigator, Mr. Howes told the Investigator that when Mr. Wilson came to work on February 21, 2013 to explain that he had not quit, Mr. Howes told Mr. Wilson "with performance issues and day before and it was not done, they were terminating him." (Quotation from notes of MHRC Investigator, not a recording or stenographic transcript.)

80.   Later, in a July 1, 2015 written submission to the MHRC, Best Western claimed that Mr. Wilson was terminated only for the events on February 20, 2014 and that Best Western "has never focused . . . on [Mr. Wilson's] failure to turn in his housekeeping checklist as the reason for his

termination. He was counseled for this, true. No one ever suggested that this was why he was terminated."

81.   During a MHRC "Issues and Resolution Conference" on December 23, 2014, in response to a question from the MHRC Investigator, Mr. Howes told the investigator that on February 20, 2013 "since [Mr. Wilson] left early without completing tasks [Mr. Howes] assumed he quit." (Quotation from notes of MHRC Investigator, not a recording or stenographic transcript.)

82.   Later, in a July 1, 2015 submission to the MHRC, Best Western said that "[c]ontrary to [Mr. Wilson's] suggestion that he left early on February 20 . . . his work hours were routine." However, in the same July 1 submission, Best Western claimed that Mr. Wilson "walked off the job."

83.   In a submission to the MHRC dated January 19, 2015, Best Western claimed that H.T. was not hired to replace Mr. Wilson and stated that he "was also engaged to do deep cleaning, including rug shampooing. None of these tasks were ever performed by Complainant." However, Mr. Wilson's medical records from the time prove that he was required to perform rug shampooing.

84.   Employees similarly situated to Mr. Wilson, but who did not complain about discrimination, committed more serious offenses that those

alleged against Mr. Wilson and were not terminated, including the following examples:

85.    At least one employee was caught leaving a blood-soaked sheet on a bed that she was supposed to change, but her employment was not terminated.

86.    A white female employee was twice caught failing to change sheets when she was cleaning rooms. She was given warnings and not terminated the first two times she was caught not changing sheets.

87.    A white female employee, T.P., went into a conference room where a group of customers were meeting and breakfast had been served to the group. She ate food from the breakfast the group had paid for. The group leader was very upset and Mr. Howes noted that her actions "[m]ay result in loss of that groups business." This employee was only given a written verbal warning.

88.    Later, T.P. went into Mr. Howes's office without permission on a Wednesday, opened mail that wasn't addressed to her and that contained all of the paychecks to be handed out two days later on Friday, took her check out of the envelope, and then opened another envelope with confidential reports in it. She was again given only a written verbal warning for this second serious offense and not fired.

16

89.     Another white female employee received four warnings, including warnings for tardiness, attendance, not putting a top bed sheet on beds two weeks in a row, and leaving trash in the hallway.  She was given only warnings for these violations and not fired.

90.     There was strong evidence that Ms. Paradis stole tips left for housekeepers, including evidence that tips were missing, that a tip was seen in a room, that Ms. Paradis's key-card was next used to enter the room, and that after she left, the tip was no longer in the room.  Ms. Paradis's employment was not terminated for this offense.

91.     The MHRC investigator issued a report on June 15, 2015 recommending a finding that there were reasonable grounds to believe that Mr. Wilson was unlawfully retaliated against for engaging in protected activity.

92.     The MHRC issued a Statement of Finding on July 15, 2015 that "[t]he Commission has conducted an investigation of the above named complaint and has determined that there are reasonable grounds to believe that the Complainant, Conrad O. Wilson, has been retaliated against for engaging in protected activity."

93.     On July 28, 2015, the MHRC issued a Notice of Failed Conciliation notifying him of his right to file suit in court within 90 days.

94.     On August 14, 2015, the EEOC issued a Notice of Right to Sue notifying him of his right to file suit in court within 90 days.

95.     Under 5 M.R.S.A. § 4622, Mr. Wilson has satisfied one or more of the prerequisites to be awarded attorney fees and all available damages under the Maine Human Rights Act.

96.     Mr. Wilson has exhausted his administrative remedies for all claims in this action that require administrative exhaustion.

97.     Best Western acted with actual malice and reckless disregard for Conrod O. Wilson's civil rights protected under the Maine Whistleblowers' Protection Act,  the Maine Human Rights Act, Title VII of the Civil Rights Act of , and 42 U.S.C. § 1981.

98.     Mr. Wilson was discriminated against because of his race, color, national origin, sex and age and fired in retaliation for opposing what he reasonably believed to be illegal discrimination against him based on his race, color, national origin, sex, and age and for complaining about what he reasonably believed to be violations of law.

## Legal Claim

99.     The allegations in paragraphs 1-98 are realleged.

100.   By virtue of the foregoing, Defendants intentionally discriminated against Plaintiff with respect to Plaintiff's compensation, and

the terms, conditions, and privileges of employment because of Plaintiff's

race, color, national origin, ethnicity, sex and age.  Plaintiff was terminated

because of his race, color, national origin, ethnicity, sex and age and in

retaliation for reporting and opposing unlawful discrimination against him

because of his race, color, national origin, ethnicity, sex and age.  Plaintiff

suffered adverse, tangible employment actions by his supervisor and the

General Manager of Best Western.  Defendants coerced, intimidated, and

interfered with Plaintiff's exercise or enjoyment of the rights granted or

protected by the Civil Rights Act of 1866, 42 U.S.C. § 1981, the Maine Human

Rights Act and Title VII of the Civil Rights Act of 1964 and because he

exercised or enjoyed those rights.  Plaintiff was discharged and otherwise

discriminated against in violation of the Maine Whistleblowers' Protection

Act with respect to Plaintiffs location, compensation and terms, conditions,

and privileges of employment because he reported and opposed, in good faith,

what he reasonably believed to be violations of the law, codes, and

regulations of Maine and of the United States.  Given the foregoing,

Defendants have violated the Civil Rights Act of 1866, 42 U.S.C. § 1981, Title

VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000e-2000e-12,

the Civil Rights Act of 1991, 42 U.S.C. § 1981a, the Maine Human Rights Act,

5 M.R.S.A. §§ 4551-4634, and the Maine Whistleblowers' Protection Act, 26

M.R.S.A. §§ 831-840.  Plaintiff is pursuing all possible methods of proving

this discrimination, including but not limited to, circumstantial and direct evidence, pretext evidence, causation based on a single unlawful motive, and causation based on mixed motives, at least one of which is an unlawful motive.

101.   As a direct and proximate result of the Defendants' intentional discrimination, harassment and retaliation against Plaintiff, he has suffered and will continue to suffer damages, including, but not limited to lost wages and benefits, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, injury to career, deprivation of professional and career opportunities, loss of self-confidence, and other pecuniary and non-pecuniary losses.

WHEREFORE, Plaintiffs request relief as follows:

(a)    Enter declaratory relief that Defendants have engaged in unlawful discrimination, harassment and retaliation against the Plaintiff;

(b)    Enter injunctive relief ordering Defendants to require affirmative training and other steps to reduce the likelihood of race, color, national origin, ethnicity, sex and age discrimination and unlawful retaliation in their Maine operations in the future, and order Defendant to desist from all unlawful retaliation and discrimination against employees in Maine on the basis of race, color, national origin, ethnicity, sex and age;

20

(c)     Award back pay for lost wages and benefits, prejudgment interest on back pay and benefits, and reinstatement or front pay for future lost wages and benefits;

(d)     Award compensatory and punitive damages in amounts to be determined at trial and prejudgment interest thereon;

(e)     Award Plaintiff his full costs, including reasonable attorney's fees and expert fees;

(f)     Award such further relief as is deemed appropriate.

Respectfully submitted,

Date:   October 26, 2015

David G. Webbert, Bar No. 7334
Max R. Katler, Bar No. 5227
Johnson, Webbert & Young, L.L.P.
160 Capitol Street, P.O. Box 79
Augusta, Maine   04332-0079
Tel: 207-623-5110

*Attorneys for Conrod Wilson*